The District Court's grant of summary judgment should be reversed for three reasons. First, the District Court erred in concluding that Mrs. Sims' front yard and closed front yard was not constitutionally protected curtilage. Second, Officer Stanton's warrantless search of that curtilage violated Mrs. Sims' Fourth Amendment right to unreasonable search. And third, the Court erred in granting qualified immunity because, in fact, there was a constitutional violation and a reasonable officer would have known that it would have been inappropriate and in violation of the law to proceed on to Mrs. Sims' premises. The District Court's grant of summary judgment should be reversed for three reasons. First, the District Court erred in concluding that Mrs. Sims' front yard and closed front yard was not constitutionally protected curtilage. Second, Officer Stanton's warrantless search of that curtilage violated Mrs. Sims' Fourth Amendment right to unreasonable search. And third, Officer Stanton's warrantless search of that curtilage violated Mrs. Sims' Fourth Amendment right to unreasonable search. That's true, Your Honor. I think, however, it's my understanding, because the Court has decided the issue, if this Court reversed it, that I believe that would effectively resolve the issue of qualified immunity, at least based on the current – the Court's current holdings, current order. So unless there are new facts or something that would change the analysis, I believe that it would probably be foreclosed. It wouldn't be if we reversed on the ground that there was a dispute of fact. That's correct, Your Honor. If you reverse on the ground there was a dispute of fact, Your Honor, that would be correct. Then, of course, it would go back to trial court and perhaps even go to the jury to determine the issues of fact. So that would be correct, Your Honor. But at least the matter would proceed on the merits, Your Honor, which I believe it should. Yes, that's true. Now, with regard to the facts of the matter, on May 27th, an individual called 911, indicating that there was a fight involving seven black males and believing a bat was involved. The individual also indicated that they believed some of the individuals may have been going into Unit A4. The individual did not provide any other identifying features, nothing in terms of clothing, nothing in terms of size, in terms of complexion, nothing else. Officer Skanton and his partner, Officer Massey, were the first individuals to arrive, officers to arrive at the scene. Excuse me. May I ask, you said there was seven black individuals and that there was a fight? That there was a fight, yes, Your Honor, and involving that someone had a bat. A baseball bat. A baseball bat? Yes, Your Honor. Did the caller say black individuals? The declaration of Mike Skanton just says individuals. I believe, Your Honor, that the caller did say black individuals. I believe so, Your Honor. I'll double-check that and address it again on rebuttal if I'm incorrect. When the officers arrived at the scene, there are different accounts from both officers of what they observed. The driving officer, Officer Massey, indicated that he saw three individuals standing in front of them in the street. Officer Skanton indicated that he saw the three individuals on the left side of the street lurking in the shadows. As they proceed, Officer Skanton indicates that two of the individuals proceed into an apartment complex and then one of the individuals proceeded to cross the street in front of the officers and walk at a quick pace toward Unit A5. At no point did the officer indicate anything about seeing any identification features of gang activity, whether it be clothing, whether it be gang signs, whether that be any type of saying anything, or did the officer indicate that they saw any type of weapons or any type of indicia of someone being involved in a fight, whether that be injury, whether that be the loud noise, whether that be tussling. Now, what's important, Your Honor, there's a difference between what the officers indicate happened and what the plaintiff, the appellant, indicates happened. And that goes, I think, Your Honor, to why really summary judgment should not have been granted here. The appellant's version is a little bit different. She indicates, Your Honor, that she had been talking with Bibbs, who is the individual that the officers pursued, in front of her home for a few moments, I believe, and that there had been an altercation. She had been talking to Bibbs for a few moments in front of her home, and then they retreated back inside of her gate. During her deposition testimony, she indicated, in fact, that she had not seen officers and was not aware of the presence of officers. And that's significant, Your Honor, because, in fact, the officers are claiming that Bibbs, that the individual Patrick, was aware of their presence and that, in fact, he was fleeing, but that he walked at a fast pace. Ms. Sims indicates she didn't see any officers, she didn't see Bibbs fleeing anyone, and that he walked, in fact, into her gate. Is Bibbs and Patrick the same person? They are, Your Honor. Did the cops say they saw him with a bat, with him with a bat? Your Honor, which is very interesting, because at one point, Officer Stanton, the appellee, he indicates that as Patrick walked across the street in front of the car, Patrick was only 7 or 8 yards away. Very close. And a bat, Your Honor, would be probably about 2 1⁄2 feet or so long. But not with a bat? Not with a bat. What the officers indicate, they cannot tell if he had any weapons. Well, I would submit that at that close of a distance, if the individual had a bat, he would see a bat. Was there a dispute over ñ is there an issue and dispute as to whether the officer ordered Patrick to stop or whether he says he ordered and Patrick says he didn't hear? The dispute, I believe, Your Honor, is that there is no dispute. Ms. Sims cannot say whether or not the officers ordered Patrick to stop. What she did say is that she did not hear it and that she observed Patrick and she did not observe Patrick appear to be fleeing from an officer or turning as if he heard an officer. So from Ms. Sims' statements, Your Honors, we believe that there is a bit of a factual dispute as to what happened. So far, Patrick has not made ñ did not make a statement in the case, and so we don't have what his knowledge and recollection of the events are. Was Patrick deposed? Patrick was not deposed in this matter, Your Honor. Now ñ Let me ask you this. If the police are called to a fight and they arrive at the location where they're called to and they see somebody walking away from the incident into the apartment where the caller says it looks like they were headed, why wouldn't the officers be entitled not to arrest but make an investigative stop? Well, a good fact there, in fact, is that these individuals were not walking into the unit where ultimately the officer kicked in the gate. The ñ Okay. Take that element out of it. They arrive at the scene. They see people who generally meet the description. Why wouldn't the officers be within their rights to make an inquiry, an investigative stop? I would argue, Your Honor, that reasonable suspicion, and it has those two elements, the first element being that, in fact, a crime was either committed or about to be committed. And I recognize, Your Honor, that because the call indicated that there was a fight, that that element would probably be met. But it's the second element that was lacking here. The second element, that there be a reason to believe that the individuals who the officer intends to detain was involved in that. I don't mean to arrest, but just to ask questions. Yes, Your Honor. I'm talking about for reasonable suspicion, that standard, not for the probable cause. In fact, the district court agreed that there clearly was not probable cause. But in terms of the articulable suspicion that, in this case, Patrick was involved in an incident involving a fight, there was none. It was not a situation where there perhaps was a witness who indicated that Patrick or these individuals were involved. And, in fact, the only description, if there is much of one, is that there were some black males involved. Do we have a transcript of the call? I actually do not have a transcript of the call with me. I did not bring that, Your Honor. It wasn't part of the excerpts of record. I believe, Your Honor, that I believe I had submitted it. And if I did not, Your Honor, I apologize. Actually, my last night, my excerpts got locked in somewhere, and so I don't have them with me. All right. So I don't know on these facts whether or not it's, and with what I have, whether or not it's true that the caller said someone was walking toward Unit A4. Because, clearly, at least two of them weren't. And what I did submit, I believe, in the excerpts of the record was the actual police report. And now I believe, as I recall, that in the police report, it did indicate what the officers, I believe, were informed. I could beg the Court's indulgence for just one moment. Yes, Your Honor, in the excerpts of the record, I know that I did submit a copy of the police report. I have the police report, and it just says, typically, when officers respond to this particular house, subjects flee into the units and lock the doors.  flee into the units and lock the doors. I have personally arrested a subject from Apartment A4. I don't see where on the radio call. Your Honor, as I'm looking, as I'm looking at it. See, I don't think they said A4 in the call. It seems to just talk about 5017 Thorne Drive. Your Honor, as I'm looking at the police report, I believe, in fact, that you're correct, it's not in the police report. And I believe that I failed to. I think the only place where it appears is the declaration of the police officer, Mike Stanton. Unless it's actually, you have a transcript of the call. I don't have that with me, Your Honors. But I do believe that that was actually in the transcript. But I did not file that. And that was an oversight on my part. But essentially what you have here, Your Honors, you have, first you have a discrepancy on really what the officers saw when they arrived. One of the officers said that they saw the individuals in the middle of the street. That would place them in the street, perhaps in the area where the incident occurred. The other officer indicated they were on the left side in the shadows. So right there, in terms of what their behavior was, one officer is indicating that their behavior is somewhat nefarious in terms of describing it as in the shadows of the street. And the other officers indicated that they were in the street and just kind of walking towards them. Then in terms of an actual description, simply they were black males. But beyond that, Your Honor, unless any black male in the area could simply be stopped at that point, there was no description in terms of height, weight, clothing or anything of the like, Your Honors. And so in terms of reasonable suspicion to believe that Patrick was involved in any type of an incident, there really was none, Your Honor, only that he simply was there. And so the real question becomes whether he had an obligation simply to stop for the officers. And I would argue that absent that second element of reasonable suspicion being met, that there be some reasonable or that there be some articulable facts to believe that, in fact, Patrick was involved in a crime, then they're lacking one of the elements. Let me ask you a question. Just assume for the sake of discussion. I know this is not your position, but just assume for the sake of discussion that the officers had the right to make an investigative stop. Tell the guy, stop, I want to talk to you for a second. And he just goes on his merry way, doesn't stop. What can the officer do about that? At that point, I would argue, Your Honor, that basically under Welch and the cases that follow, that the officer still, Your Honor, would not be entitled to pursue on to Fourth Amendment-protected property, basically the home and the curtilage. And the idea there, Your Honor, is that this would be a minor offense. It's not a felony offense, the type of cases where clearly the court has allowed an officer to pursue on to private property. And there is language, of course, in the Welch case and I believe in this Court's Johnson case, that basically, but in the rarest of circumstances, would a minor misdemeanor, basically offense, warrant an officer proceeding on to Fourth Amendment-protected property, whether it be home or I would argue curtilage, because, of course, this Court has indicated, as well as the Supreme Court, that the curtilage of a home also has the Fourth Amendment-constitutionally protected privacy interest. So it's your understanding of the law, then, if the officer, assuming, has a right to make an investigative stop and the person doesn't want to stop and can somehow get into a house, that's, okay, you know, all the oxen free, that's it, right? Well, Your Honor, you know, and I would say the police can go have probable cause and can go get a warrant. Right. Exactly. If there's no probable cause, it's just an investigative stop. Yeah. If there's no probable cause, Your Honor, then I would argue that they cannot pursue on that private property. However, Your Honor, they're permitted to, at that point, they can observe the premises. They can also knock, right? Can't they knock on the door? Simply, they can knock and seek a consensual entry. In this case, nothing of the sort happened. Simply, the officer ran, kicked in the door. And interestingly enough, there's no question, really, Your Honors, when you look at the fact of the situation, that it was curtilage. Even though the appellee- I think maybe you ought to stop. You've got one minute left. I'll yield, Your Honors. Thank you very much. Good morning. May it please the Court, Pete Ferguson for Mike Stanton. I think the best place to start is in the beginning of this case, and that's the pleadings of this case, because that's what really gets us here. And it's the pleadings that begins with a lot of the problems that the district court had, because the pleadings had allegations that Ms. Sims does not agree with, facts concerning the incident. Indeed, only when we got the reply brief here at this court did we learn that those facts came from Plaintiff's counsel, and they didn't come from Ms. Sims. Plaintiff's counsel makes a statement- Take your facts. I'm sorry? Take your facts as your client reports them. You get a report that there was some kind of a fight on a corner and somebody had a bat. Yes. You come and you see there are three people there, two leave and go into one place, the third heads for another apartment. What is it that-what right do you have with respect to that third person? You could ask him to stop and cooperate and give you any information he has. Yes. Is that a Terry stop? I think there's sufficiently – sufficient information, articulable facts from everything that the officer knew for a Terry stop. I mean, he had an historical- All right. So let's assume you've got a Terry stop. Yes. And the individual says, I don't feel like talking to you. Yes. Then what right do you have? Well, then I think we go to the Fourth Amendment, what's reasonable under the totality of the circumstance. If I am going to stop somebody for jaywalking, a police officer, and that individual goes into their house, I don't think a person can go bust down the door and go get that person- But if he says, I don't want to talk to you on a Terry stop, and he goes into his house, can he go bust down the door? No. What I'm saying is I think it depends on the totality of the circumstance confronting that particular case. And in that particular case, there's information the officer had that he believed was dangerous. Well, what did he believe was dangerous? Well- Seven blacks had been on a corner, and one had a baseball bat. And this person, about whom you knew nothing other than that he was on a corner, didn't want to talk to you, you didn't think he was carrying a baseball bat, did you? He didn't see a weapon on the individual. No, I said a baseball bat. If he had one, would he not have seen it? He did not see anyone with a baseball bat. Yeah. And if this individual had had a baseball bat, would he not have observed it? I don't know. You don't? No. How do you hide a baseball bat? You know, I'm not in that arena, but I think- You could put it behind your back, you know. I don't know. Clothing, it could be in the arm, it could be on the side that you don't see. I mean, but it's a baseball bat. But you're ignoring, I think, the facts that Officer Stanton had. He had a history of violent gang activity with individuals with guns and knives in this area at the location, at the location where the call was- Why don't they just go knock down that whole building and take everybody? Well, that would be wrong. Yes, it would, wouldn't it? Isn't that what he did here, only on a more minor scale? Based on this history, he saw a black man walking into a unit, did not know whether he had a weapon or not, and then he broke the gate down to get into the unit. You're ignoring, again, the historical facts, but taking the court as the court sees it. Well, the historical facts are that this is a gang area. It is a gang area. It is a gang area. A violent gang area. And lots of people live in that area who are not members of a gang. Presumably. But if you happen to move into that neighborhood, you're then subject to the treatment of having your doors broken down because it's a gang area and you're poor and you have to live in that area. Absolutely not. Absolutely not. I think we have to look at this case not in the generic sense but in the specific sense because that's all what Officer Stanton has is the specific sense of what he has at that moment. And what he has as an individual, you know, he sees individuals at the location of where the call is. It's a dangerous call of a person with a bat. Presumably you can articulate other things that may be involving people, may have guns, may have knives, may have other weapons. There's just the caller that sees a baseball bat. You can presume when gang members or people are in a fight, they might have more than just a bat. These are things that an officer for ---- So you didn't really have to see the bat. The bat's kind of irrelevant because if there had been a fight there, some of the people might have had guns or weapons. Correct. Absolutely. The bat really doesn't change anything, does it? I agree. Absolutely. The issue, though, is that if we assume we have Terry Stott and the officer has a right to order somebody, stop because I want to ask questions because that's a good thing to do. Okay. Let's assume, I said, you know, we accept your story and we get to that point. Yes. Does the Terry stop? Where I am going is ---- And someone says, I'm not going to stop and answer questions, either verbally or by his actions. Yes. What happens next? And in this moment, in no more than two seconds, when the individual goes through the gate and slams the gate, because he went quickly through the gate. Yes. Knowing the information that the officer had, he wanted for officer safety to stop that individual from not arming himself or from potentially attacking the individual or anything else that might physically cause him harm. He is in pursuit of somebody who is now in violation of the law. Albeit, it's not just that he's in violation of a 148 of the California Penal Code, resisting delay and obstructing a police officer. It's the underlying facts that are important of what precipitated why there is a 148, and that is serious crime, potentially, maybe, of a 245, a battery on somebody to cause serious bodily injury or death because you have a baseball bat. That's the reason why there has to be a stop. That's the rationale to allow the officer for his safety at this moment. At this moment, it's his safety that's, I think, paramount to anything else, to stop an individual that may harm him. Another issue, then, is isn't that always true when you're in a very violent gang area and you want to see somebody black walking down the street, and it's a violent area, and you stop and you want to ask him questions, and he says, no, I'm a law-abiding citizen. I'm just going into my house, and I don't feel like talking to you. Aren't you worried, then, that he's going in to get a gun and come out and shoot the officer? That can happen even at the nicest locations in the world. I don't think you do it at the nicest location. We've seen that. I don't think you go kick down the door across the street. And I don't think you kick down the door just because you're there, because someone's in a gang area, and he shuts the door on you. Because you heard that there was a baseball bat somewhere. Well, we've heard that there had been a... Did you worry about the danger to the officer, or was it you worried he was going in to get a gun? When you have information that there had been a fight, I think that raises the level of concern for officer safety. These are people that are in a fight and don't care about someone else's safety. Are they going to care about a police officer's safety? I don't think that the officer has to get hit in the noggin before he takes action. I think he can take some affirmative action that he believes in that split second, in that moment where he thinks somebody may be arming themselves, to stop that threat. Okay. And so the basis for the Fourth Amendment and the entry without a warrant is that the officer, knowing there had been a fight with a group of people, and wanting to find out about it, wants to question this person and is afraid that the person will have a gun if he goes into that place. So he goes in and kicks down the door. Would it make a difference if he just opened the gate? Why can't he just knock on the gate? Again, because in his mind, at that split second, he believed that that individual may be arming himself based upon his historical knowledge... If he thinks someone with the gate up is arming himself, why would he crash down the gate and run in there when if that person was arming himself that would create even more risk? Well, in his mind, he didn't think so. In his mind, if he knocked on the gate, I would believe, for officer safety reasons, you're now acknowledging, I'm right here and now I can be a target. Why does he leave, go to his car, call backup? I mean, I don't understand the logic of crashing down the gate, just the logic of it, much less the constitutionality. The logic was, in his mind, in a split second, he made a determination for his safety that that was the most appropriate thing to do. Albeit we can look 20-20 hindsight, we can have 20 different other rationales, but I think we need to give him deference to his mind, his experience as a police officer. But it's not a subjective standard, it's an objective standard. Absolutely, and if I had 100 police officers doing the same thing, I'll bet you a majority would have done the same thing. Don't we have that going on? Objectively. Where is La Mesa? Near San Diego, San Diego. Okay, oh yes, okay, I know where La Mesa is. I'm trying to unpack this in the sequence of how these events unfolded. I guess the first question is the cops are called there, and the first issue is whether they had a reasonable suspicion to do a Terry stop. Correct. If they don't, then that's the end of the ballgame for you, right? Yes. If they do have the authority to do a Terry stop, then the next question is what happens when the guy won't stop? Yes. Can they, we agree, is there probable cause to arrest him at that point? No. Well, once he refuses, there's a 148, there's probable cause. Is there any California case that says that a 148 violation is made up on these facts, failure to stop for an investigation? I believe there in my papers I cited some California authority for the same. I couldn't find anything under these facts where you just walk away from the cop who wants to talk to you. Well, I think there was the 1 Ninth Circuit case as well in Arizona where exactly the same thing happened. Okay, well, we don't have 148 in Arizona. I'm from Arizona. We're talking about California law. I can't think of a case, but I know that there are many, many cases. When you have a right to conduct a Terry stop and an individual walks away in a public place, that's a 148. So then the next prong in this sequence is there's probable cause to make what, a felony arrest or what? It's a misdemeanor arrest. Okay. He then flees into a private residence. Into a gate, into his car. It's not a store, right? It's not a car. It's not a store. It's a private residence surrounded by a gate. It's not into the house itself, but it's into a gate, into a front yard area that leads up to the landing to where the front porch is. Now, does he have a right to force an entry into the, whatever this place is, his gate surrounding the house without a warrant for a misdemeanor? For a misdemeanor under California law for hot pursuit, yes, he does. Under the Constitution. Under the Constitution, I think it's the Santana case or the Dunn case, United States, that says in hot pursuit into the home, in essence. Hot pursuit of a misdemeanor? No. I'm getting to it. The Court says in hot pursuit into the home, it should be a felony. But it wasn't particularized absolutely, and the courts have stated there may be other circumstances that it may be something less needed. Well, we have a lot of cases that say just what you said, that it's, you know, there could be a case in which this could happen in a misdemeanor. Yes. But generally, in every case we've decided, you can't do it for a misdemeanor. It seems to me your case is really not dependent on whether he was pursuing him for a crime. Your basic argument, as I've understood it, is you thought this was a dangerous person because he may have been involved in a fight where there was a baseball bat. And it was an area where there was lots of violence. And when he went into the house, you were worried about him that he might be getting a gun. And therefore, to protect the officer, he felt officer safety, it was best to pursue him into the house to see that he didn't get a gun. Isn't that your basic argument? That's basically the argument, yes. And in pursuing someone in this particular office. How can you pursue somebody in a house just because you think they're going to get a gun if there's not probable cause? Again, I don't disagree with the court. You just bought into Judge Reinhart's. No, no, no. If you're going into somebody's house on a misdemeanor, oh, if you're going into a house on a misdemeanor and the officer has cause to believe that man is going to harm himself, that might greatly be a situation where you can go into that individual's home. I would hope so, anyway, for safety reasons. Again, it would depend on the circumstances, but yes. If there's no probable cause to think that I've committed a crime, why can't I go into my house and harm myself? Why would a cop be entitled to bust down my house? He doesn't, but that's not our case. There's got to be probable cause. There has to be cause to believe a crime has been committed, and I'm pursuing that individual who flees into a house. And, frankly, if I don't believe that you're... So in order to get into the house, you have to – we have to buy your premise that he committed a 148 violation. Yes. And I believe even with a 148 violation, with the underlying facts of this case, known to the officer objectively that his actions in opening the gate were reasonable. And I think that even the district court understood the curtilage of the yard is quite different from entering into someone's home. No, it's not. Under the Supreme Court's most recent decision in the area, they made clear, again, that the curtilage is treated for constitutional purposes under the Fourth Amendment the same as a home. All right. We've taken you over your time. Thank you. Thank you very much. Thank you. I think you've got 57 seconds left if there's something urgent. All right. You have to say. Thank you, Your Honor. I wanted to clarify something. It's in hot pursuit. The caller had indicated that the individuals may be going into Unit A-5 and, in fact, Patrick went into A-4, which was a completely different unit. But in terms of the officer, when he shows up, all of this is going on in his head and has nothing to do with the objective facts. This person may be a gang member, but notice that the officer in his declaration, he doesn't indicate anything about indictive gang activity, gang wardrobe, gang signs, gang language, nothing concerning gangs. However, in order to justify this now, well, it was a gang area, and so because it's a gang area, I can come in there, kick and engage. That's essentially what this officer is asking the court to sanction here. And I believe that there's language in the Dorley case, and that's why I cited that in my brief, that really an officer's simple statement of an officer as fierce, without objective factors, is insufficient to support exigent circumstances. And that's essentially what the officer is asking the court to accept here. I believe, Your Honors, with that, I would submit. Thank you. Thank you very much. Thank you both. Thank you, counsel. Thank you. This case is arguably submitted.
judges: Reinhardt, Silverman, Wardlaw